IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 4, 2004 Session

## STATE OF TENNESSEE v. ROGER C. McANALLY

**Appeal from the Circuit Court for Henry County**
**Nos. 13423, 13424      Julian P. Guinn, Judge**

---

**No. W2003-01478-CCA-R3-CD  - Filed August 20, 2004**

---

The defendant, Roger C. McAnally, appeals as of right from his convictions by a jury in the Henry County Circuit Court for especially aggravated kidnapping, a Class A felony; two counts of aggravated robbery, a Class B felony; kidnapping, a Class C felony; three counts of aggravated burglary, a Class C felony; theft of property over $500, a Class E felony; and sexual battery, a Class E felony.  The trial court sentenced the defendant to twenty years for the especially aggravated kidnapping conviction, eight years for each aggravated robbery conviction, three years for the kidnapping conviction, and three years for each aggravated burglary conviction, to be served concurrently but consecutively to a one-year sentence for the sexual battery conviction, for an effective twenty-one-year sentence.  In this appeal, he contends that his convictions for especially aggravated kidnapping and kidnapping violate his due process rights because his confinement of the victims was incidental to the robberies.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Gary J. Swayne, Paris, Tennessee, for the appellant, Roger C. McAnally.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's participation in two robberies on September 15, 2002.  At trial, Henry County Sheriff's Department Investigator Scott Wyrick testified that he was on his way to the home of Linda Morris to investigate a robbery on September 15, 2002, when he received a dispatch that Helen and Richard Todd had also been robbed.  He said that when he arrived, Mr. and Mrs. Todd were shaken and startled.  They told him that three people had bound them and stolen

cash and jewelry. He identified various pieces of black electrical tape used to bind the Todds that he had found in the Todds' home. Jim Wheatley, a neighbor of the Todds, told Investigator Wyrick that he and his wife went to the Todds' home after hearing Mrs. Todd scream. Mr. Wheatley stated that he saw three people getting into a pickup truck and leaving the Todds' home. Investigator Wyrick testified that Mr. Todd told him the robber holding him had stated that they were not going to hurt anyone and only wanted to get to Memphis. Mr. Wheatley identified Curtis Webb in a photographic lineup as one of the robbers.

Jainniene Durham testified that on September 15, 2002, Curtis Webb was her boyfriend and that she was at a job site with Webb and the defendant. She said the defendant and Webb were cutting down and trimming trees on Mr. Todd's property. She said that in the afternoon, the defendant and Webb broke into a house, stealing a silver gun and other items. She said she remained inside the truck during the burglary. She said that both the defendant and Webb played with the gun after the burglary and that she never heard Webb threaten the defendant if he did not participate in the burglary. She said the three of them drove around in the truck while Webb looked for a second place to steal money and drugs. She said that when Webb stated that they needed to rob a house, the defendant suggested going to Como, Tennessee, because it was more isolated. She said that they stopped at a house around 7:00 p.m. and that the defendant and Webb were inside for about forty-five minutes. She said she again remained in the truck as a lookout. She said that when the two men returned, they discussed how the woman inside was frightened and was screaming and kicking. She said they mentioned that they taped her hands and feet together against a bed rail and a bed post. She said that Webb had told her he had worked for the victim in the past and knew she lived by herself. She said both men were wearing bandanas over their faces during the robbery. She said that after the first robbery but before the second, she never saw Webb point a gun at the defendant and demand that they rob for a second time. She said she was the only person that protested the robberies.

Ms. Durham testified that they drove to another house and that Webb told her to go to the house and ask to use the telephone. She said that before she reached the house, the defendant and Webb rushed past her and broke down the door. She said Webb grabbed an elderly woman in the house while the defendant subdued an elderly man. She said they taped and gagged the two victims. She said the defendant told the victims that they were not going to be hurt. She said that when the telephone rang, the defendant told her to pull the cord out of the wall. She said that when they left the home, the defendant drove into and out of a ditch. On cross-examination, Ms. Durham testified that Webb had pointed the gun at her in a threatening manner. She said that Webb was waiving the gun in the air but that the gun was not pointed at the defendant in the same manner in which he pointed it at her. She said Webb threatened her by telling her that she did not want to end up like Vickie, a girl who was murdered in Florida. She denied telling a relative of the defendant's that Webb forced both her and the defendant to participate in the robberies. She acknowledged writing a letter which stated that Webb was the only one responsible for the robberies.

On September 15, 2002, Debra Cloyd saw a green pickup truck around 1:30 p.m. at her neighbor's house and it was there because her neighbor was having his trees trimmed. When she went outside later in the day, she saw the green truck at the home of the Hollises. She knew the

Hollises were not home and she later walked to the house next to the Hollises, the Dotsons' home. The doors had splintered wood and the wood frame had been kicked in at the Dotsons' home. When she went inside, she saw that couches had been flipped over and she left to call the police. Ms. Cloyd believed she saw three men inside the truck when it left the Hollises' home. She saw one man throw something into the back of the truck. She identified Curtis Webb as one of the individuals in the green truck. James Vaughn also entered the Dotsons' home while Ms. Cloyd was inside and stated that every room had been ransacked.

Deputy George Smith and Officer John Bradley of the Henry County Police Department were each dispatched to the home of Linda Morris around 8:00 p.m. on September 15, 2002. They found her with her hands and feet bound with electrical tape. Deputy Bradley stated that Ms. Morris had been hogtied.

Linda Morris testified that on September 15, 2002, around 7:00 p.m., she was lying down and wearing her boxer short pajamas when she heard a loud noise. She said she looked out her window and saw a truck parking next door but was not alarmed because she assumed the occupants of the truck were going to the other house. She said that about three minutes later, she heard someone running through her kitchen and then saw a big man wearing a bandana and carrying a gun. She said the man told her to turn over on her bed and put her hands behind her back. She said he began taping her hands together and asking for money, drugs, and guns. She said he told her that he would hurt her if she did not cooperate. She said she could hear someone downstairs while the man upstairs restrained her. She said that she believed she knew the man's voice but was unable to determine who was in her house. She said that after she told the man she had Xanax in her purse, the man yelled to the person downstairs to get the Xanax.

Ms. Morris testified that the person downstairs climbed the stairs and joined the man with the gun in her bedroom. She said she never saw the second man because she kept her face in a pillow. She said that the man with the gun began taping her feet together and that the second man began rubbing her buttocks. She said the man with the gun told the second man to stop rubbing her buttocks because that was not the reason they were there. She said that one of the men then tied her hands to her feet and unplugged the telephone cords. She said the robbers were inside her house for about thirty minutes.

With regard to the difficulty of freeing herself after the robbers left, Ms. Morris stated the following:

> I rolled out of the bed. . . . I hit the floor and I had to scoot to the steps sideways because I had this electrical cord tied to my hands and it was very uncomfortable to say the least but I managed to get down the steps without falling down them.

-3-

When I got down there I scooted into the kitchen because I had some knives on my fireplace . . . and I was determined I was going to cut myself loose but I couldn't get to them.

I went to the phone. They had . . . unhooked my phone upstairs and my cordless phone downstairs, they threw it, I didn't know where it was at, so I got to the . . . wall phone by the back door in the kitchen and I pulled it down with my feet. I got a hold of the cord. I got a cord that goes all the way to the floor and I pulled it down with my teeth. At that time . . . I had . . . lost the feeling in my fingers and so I had them behind me and I was trying to punch 911 but I couldn't do it so I went to my bathroom. In my top drawer I knew I had some scissors and why I thought I could do this, I don't know, but I kicked, you know, it has got a latch on it and you pull it out and it won't come out so I had to take my feet and lay back and try to kick it out and try to get my scissors but that didn't work either so I scooted back into the kitchen and I took my big toe and I kept trying to dial 911 and thank goodness my wall phone has the little thing where you could punch it when you get the wrong number and you get that operator . . . .

And so finally after . . . it seemed like eight tries, I got 911. Well then the phone was upside down, the ear piece was upside down and I was trying to lay down and shout into the phone. I couldn't really hear the lady I contacted. I don't know who she was. . . . But the woman . . . sent me some help.

Helen Todd testified that on September 15, 2002, at about 9:00 p.m., her husband told her that he thought he heard something and that she went to the front door in order to determine if anyone was outside. She said a woman was climbing the steps to her front porch and asked if she could use a telephone. She said she was leery of the woman and began to shut the door when a man wearing a bandana rushed the door. She said that she screamed and ran toward the backdoor in the house but that the man caught her and put her on the floor. She said the man put his knee in her back and told her that they wanted money and jewelry. She said the man told her that he needed money to get to Memphis. She said the man then bound her and told her not to scream again. She said that later, she heard a second man's voice state that they needed to leave. On cross-examination, she said that she did not know if the man that bound her had a gun.

Richard Todd testified that on September 15, 2002, around 9:00 p.m., a woman came to his house and asked to use the telephone. He said that he next saw two men wearing masks run into the house, shouting to get onto the floor. He said that after hearing his wife scream, he charged both men but that they were too strong and put him on the floor. He said one man held a knee to his back. He said that they bound him with electrical tape and that it was so tight that it bruised his arms. He

said the men removed the contents of his wallet and his pockets. He said that when his telephone rang, one man ordered the woman to rip the phone cord from the wall. He said the woman pulled the wrong cord and the phone rang again, which upset one of the robbers. He said that he saw lights begin to shine at his neighbor's home and that the robbers began to leave. He said that after they left his house, he heard three shots.

At around midnight following the robberies, Deputy Stephen Matheny of the Weakley County Sheriff's Department was at a gas station when the defendant, who was in a light green, older model pickup truck, waved at him and asked him where a certain road was located. Deputy Matheny began to leave the gas station when he realized the truck matched the description of a vehicle for which he was supposed to be looking. He approached the defendant and told him about the truck matching the description. He acknowledged that the defendant was cooperative. The defendant was arrested later that day. At the conclusion of the trial, a jury convicted the defendant of especially aggravated kidnapping, two counts of aggravated robbery, kidnapping, three counts of aggravated burglary, theft of property over $500, and sexual battery.

The defendant contends that his convictions for especially aggravated kidnapping and kidnapping violate his due process rights because the kidnappings were incidental to the robberies. The state contends that the confinement of the victims in this case was significant enough to support separate convictions for kidnapping. We conclude that the defendant is not entitled to relief.

Our supreme court has held that a conviction for kidnapping may violate due process if the kidnapping is "essentially incidental" to an accompanying robbery. State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991). However, Anthony does not preclude separate convictions for kidnapping and robbery under every circumstance. State v. Dixon, 957 S.W.2d 532, 534 (Tenn. 1997). In Dixon, the court stated, "The Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery." Id. Thus, we must determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." Anthony, 817 S.W.2d at 306. The court noted that the determination of whether a restraint is incidental is "highly dependent on the facts in each case." Id. If the restraint used is not necessary for the completion of the robbery, a separate conviction for kidnapping does not violate due process.

In the present case, Linda Morris was held at gunpoint and ordered to put her face in the pillow. Her hands were then tied behind her back, her feet were tied together, and her hands were later tied to her feet. She also testified as to the difficulties she incurred after the robbers left, including being forced to use her teeth and toes to call 9-1-1. She stated that she was "uncomfortable to say the least" and that she lost the feeling in her fingers while she was bound. With regard to the incident involving the Todds, Mrs. Todd testified that she was attempting to run out of the house when the defendant caught her, put her on the ground, and put his knee in her back. She said the

-5-

defendant proceeded to tie her up. Mr. Todd testified that one of the robbers forcefully held him on the floor, put his knee in Mr. Todd's back, and then bound him with electrical tape. He said that his arms were bruised as a result of the restraint. Ms. Durham testified that both Mr. and Mrs. Todd were also gagged.

We conclude that the restraint utilized by the defendant and Curtis Webb on the victims in this case exceeded that necessary for the completion of the robberies. With regard to Ms. Morris, she followed the robbers' orders after seeing that one had a gun. She made no attempt to flee or prevent the robbery before or after she was restrained. In addition, even were we to conclude that some restraint was needed, the restraint used against Ms. Morris was excessive. Tying her arms behind her back or tying her feet together alone would have been sufficient to prevent her from interfering in their robbery. They decided, however, to tie both her hands and her feet together and then add to her discomfort by tying her hands to her feet. Further, we note that the restraint on Ms. Morris obviously limited her ability to obtain assistance as shown through her testimony regarding her difficulties in calling 9-1-1. The victim's struggle to obtain assistance significantly increased her likelihood of being harmed. See Dixon, 957 S.W.2d at 534 (holding that the kidnapping conviction did not violate due process when the victim's confinement lessened the risk of detection to the defendant but increased the risk of harm to the victim).

With regard to the Todds, Mrs. Todd was fleeing her house when the defendant caught her. She had no intention of physically stopping the robbery. In addition, the defendant put his knee in her back while she was on the floor and gagged her. Mr. Todd testified that he was confined similarly and that his arms were injured as a result of the attack. The Todds, an elderly couple, presented little risk to the defendant and Webb's completion of the robbery. Putting their knees in the elderly victims' backs, gagging them, and the injury to Mr. Todd reflect a confinement unnecessary to commit the robbery in this situation. We conclude that the especially aggravated kidnapping conviction for the incident with Ms. Morris and the kidnapping conviction for the restraint of the Todds were not incidental to the robbery and, therefore, do not violate the defendant's due process rights.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE